**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **DARLENE SMITH,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO. 5:12-CV-62 (MTT)** |
| ) | |
| **HOUSTON COUNTY SHERIFF'S** ) | |
| **OFFICE, _et al.,_** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

<u>**ORDER**</u>

This matter is before the Court on the Defendants' motion for summary judgment. (Doc. 25).  The Plaintiff did not file a response to the Defendants' brief in support of their motion or the Defendants' statement of material facts.  Thus, the Court finds that the facts as set forth by the Defendants in their statement of material facts (Doc. 26) are admitted.  M.D. Ga., L.R. 56.  The Court has also reviewed the record and finds the facts undisputed.  For the following reasons, the motion is **GRANTED**.

**I.   FACTUAL BACKGROUND**

This action arises out of a traffic stop that took place on the evening of February 24, 2010.[1]  Plaintiff Darlene Smith was traveling north along Highway 41 in Houston County, Georgia on her way home.  (Doc. 26 at ¶ 1).  As Smith traveled north, she

---

[1] The video taken from the patrol vehicle's dashboard camera displays the date as February 24, 2009. The Defendants believe this is a system error.  In any event, none of the Parties dispute that the incident occurred on February 24, 2010 or that the video is an accurate recording of the events that transpired on that night.

passed Defendant Deputy Kyle Stokes, of Defendant Houston County Sheriff's Office,[2] who was traveling south on Highway 41.  (Doc. 26 at ¶ 2).  Stokes's on-board speed detection device determined that Smith was traveling at a speed of 72 miles per hour in a 55 mile per hour zone.[3]  (Doc. 26 at ¶ 3).  Stokes made a u-turn and began to pursue Smith's vehicle.  (Doc. 26 at ¶ 4).  There were no other vehicles travelling north on Highway 41 between Smith and Stokes.  (Doc. 26 at ¶ 5).  It took Stokes almost a full minute to catch up to Smith, and Smith turned left off the highway onto Avondale Mill Road once she realized Stokes intended to stop her vehicle.  (Doc. 26 at ¶¶ 5-6).

As Stokes began to approach Smith's vehicle, he could hear cursing and screaming coming from the driver's side.  (Doc. 25-1 at 2).  Stokes also observed Smith banging her head against the steering wheel and her hands against the dashboard, and he heard the passenger, Smith's teenage son, telling her to calm down.  (Doc. 25-1 at 2).  For his safety, Stokes walked to the passenger side of the vehicle and asked Smith's son to roll down the window.  (Doc. 25-1 at 2).  As Smith's son complied, Smith began to scream again and demanded to know Stokes's cause for stopping her and the speed limit for the highway.  (Doc. 25-1 at 2).

Stokes asked Smith to produce her driver's license and insurance card five times.  (Doc. 26 at ¶¶ 8-10).  Smith refused to hand over the information after each

---

[2] Smith has also brought suit against Defendants Houston County and Sheriff Cullen Talton.  Her complaint, however, contains no factual allegations regarding these two Defendants.

[3] The Defendants' expert witness, David G. Brown, reviewed the video recorded by Stokes's dashboard camera.  Brown testified that Smith's vehicle covered 4,234 feet from the point she passed Stokes's vehicle as he was travelling in the opposite direction to the moment she passed an "intersection ahead" sign shortly before Stokes pulled her over.  (Doc. 25-2 at ¶ 15).  Using the internal timer from Stokes's dashboard camera, Brown found that Smith covered that distance in 42 seconds, yielding an average speed of 68.7 miles per hour.  (Doc. 25-2 at ¶¶ 16, 20).

request and demanded to know why she was pulled over and how fast she was going. (Doc. 26 at ¶¶ 9, 11).  In response to one of Stokes's requests, Smith gestured by pulling her right index finger across her throat in a cutting motion.  (Doc. 25-1 at 2). Because of Smith's failure to comply with instructions Stokes requested back-up.  (Doc. 26 at ¶ 12).  Stokes also instructed Smith that her failure to comply would result in her arrest for obstruction of justice.  (Doc. 26 at ¶ 13).  Stokes gave her this warning eight times before Smith partially complied with his instructions and handed over her driver's license.  (Doc. 26 at ¶ 17).  However, Smith refused to hand Stokes her insurance card and made the throat cutting gesture again.  (Doc. 25-1 at 2).  Smith also placed her hand on her gear shift as if she meant to put the vehicle in gear.  (Doc. 25-1 at 2).

Smith began screaming again, and Stokes told her she was "going to calm down, or [she was] going to jail."  (Doc. 26 at ¶¶ 18-19).  Smith continued to shout angrily despite Stokes's warning, and Stokes decided to arrest her.  (Doc. 26 at ¶¶ 20-21). Stokes walked around to the driver's side of Smith's vehicle and opened her door. (Doc. 26 at ¶¶ 21-22).  He instructed Smith to unfasten her seatbelt and get out of the car.  (Doc. 26 at ¶ 24).  She refused and told Stokes, "No.  I cooperated."  (Doc. 26 at ¶ 25).  Stokes continued commanding Smith to exit the vehicle, but she remained seated. Stokes realized he had to physically remove Smith from her vehicle, and he reached inside to unfasten her seatbelt.  (Doc. 26 at ¶ 28).  Stokes gave Smith one final opportunity to comply, but she again shouted, "No.  I cooperated."  (Doc. 26 at ¶¶ 30-31).

Stokes began to pull Smith out of her vehicle, while she continued to resist, and once she was out of the vehicle, he instructed her to remain on the ground.  (Doc. 26 at

¶¶ 33-35).  Smith began to struggle with Stokes as he attempted to handcuff her.  Over the next 15 seconds, Stokes instructed Smith to "stay down" seven times, but Smith continued to struggle and yelled at her son to take a picture.  (Doc. 26 at ¶ 41).  Stokes made three attempts to grab Smith's right hand to put her in handcuffs, but she resisted each time by jerking her arm back toward the ground.  (Doc. 26 at ¶¶ 43-45).  Stokes then deployed his ASP baton and warned Smith three times that he would strike her with it if she did not give him her hands.  (Doc. 26 at ¶ 46).  Smith did not comply with the first two warnings but partially surrendered one of her hands after the third warning.  (Doc. 26 at ¶ 47).  Stokes did not strike Smith with the baton.  (Doc. 26 at ¶ 48).

Smith continued to struggle to prevent Stokes from securing her left hand.  (Doc. 26 at ¶¶ 49-50).  Stokes instructed her at least five more times to put her left hand behind her back before she finally complied.  (Doc. 26 at ¶ 52).  Smith continued to struggle even after Stokes secured her hands.  (Doc. 26 at ¶ 53).  Stokes successfully applied the handcuffs nearly four minutes after his initial effort to get Smith out of the vehicle.  (Doc. 26 at ¶ 56).  After securing her in handcuffs, Stokes instructed her to get up, and he escorted her over to the front of his patrol vehicle.  (Doc. 26 at ¶¶ 57, 60).  Stokes directed her to get on the hood of his vehicle.  (Doc. 26 at ¶ 61).  Smith failed to comply, and instead, she attempted to stand upright and get the attention of passersby.  (Doc. 26 at ¶ 62).  Stokes told her to stay on the hood at least five more times as he attempted to pat her down.  (Doc. 26 at ¶ 63).  Smith did not comply with his instructions, often raising her torso up off the hood.  (Doc. 26 at ¶ 64).

Stokes then instructed Smith to get in his vehicle at least six times, but she refused.  (Doc. 26 at ¶¶ 65-67).  Although he eventually got her into the backseat, she

refused to put her legs and feet in the vehicle because she saw her driver's license and insurance card lying on the ground and was attempting to pick them up.[4]   (Doc. 26 at ¶¶ 69-72).  After Stokes properly secured her in his patrol vehicle, Smith continued to scream and act unruly.  (Doc. 26 at ¶ 74).  Smith also ridiculed Stokes with racial slurs and pejorative insults throughout the drive to the jail.  (Doc. 26 at ¶ 75).  Smith accused him of confronting her without backup so he could get away with hitting her, and she also insinuated he commits domestic violence by accusing him of wanting someone to beat other than his wife and kids.  (Doc. 26 at ¶¶ 81-82).

Once Stokes arrived at the jail, Smith refused to comply with the demands of other Houston County Sheriff's Office deputies who instructed her to get out of the vehicle at least six times before she finally consented.  (Doc. 26 at ¶¶ 83-84).  Stokes had no further interaction with Smith after she was taken to the jail booking area.  (Doc. 26 at ¶ 85).

## II.  DISCUSSION

### A.  Motion for Summary Judgment Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)).  The burden rests with the moving

---

[4] Smith testified that she attempted to pick up her license and insurance card because she was concerned Stokes would lie by denying she had them in her possession, and she did not want to get in trouble for not having them.  (Doc. 28 at 30:17-24).

party to prove that no genuine issue of material fact exists.  *Info. Sys. & Networks Corp.*, 281 F.3d at 1224.  The party may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  The non-moving party does not satisfy her burden "if the rebuttal evidence is 'merely colorable, or is not significantly probative' of a disputed fact."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)).  However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge … .  The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  *Anderson*, 477 U.S. at 255 (citation omitted).

## B.  Claims Against Houston County, Georgia and Houston County Sheriff's Office

Smith alleges that Houston County has a "pattern, practice, policy or custom of violating citizens' constitutional rights" and that Houston County ratified Stokes's conduct when it failed to discipline him.  (Doc. 1 at ¶¶ 35, 36).  The Supreme Court has placed strict limitations on municipal liability under Section 1983.  *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003).  "A county's liability under [Section]

1983 may not be based on the doctrine of respondeat superior." *Id.* Instead, only when the county's "official policy" causes a constitutional violation may a county be held responsible. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Smith can establish an official policy of Houston County by showing "either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." *Grech*, 335 F.3d at 1329 (citations omitted).

However, Houston County, a local governmental entity which is controlled by the Houston County Board of Commissioners, may only be held liable for Section 1983 violations resulting from "policies and customs for which the county entity has some control and responsibility." *Id.* at 1343. "[C]ounties have no authority or control over, and no role in, Georgia sheriffs' law enforcement function." *Id.* at 1336. Counties also have no authority over the training or supervision of the sheriff's deputies, who are employees of the sheriff and not the county. *Id.* Further, a sheriff does not act as a policymaker for a county under Section 1983 when performing his law enforcement function. *Id.* at 1348.

The traffic stop and arrest conducted by Stokes was undoubtedly a law enforcement function of the Houston County Sheriff's Office. Houston County had no authority or control over this activity or over Stokes's training or supervision. Further, because this action involves a law enforcement function Sheriff Talton did not act as a final policymaker for the county. Accordingly, there is no legal basis for holding Houston County liable for Smith's alleged injuries pursuant to Section 1983, and Houston County is entitled to summary judgment on Smith's claims against it.

Smith makes the same bare allegations against Houston County Sheriff's Office; i.e., it has a "pattern, practice, policy or custom of violating citizens' constitutional rights[,]" and it ratified Stokes's conduct when it failed to discipline him.  (Doc. 1 at ¶¶ 35, 36).  However, Houston County Sheriff's Office is not a legal entity capable of being sued under Georgia law.  *Howell v. Houston Cnty., Ga.*, 2011 WL 3813291, at *29 (M.D. Ga.); *see also Dean v. Barber*, 951 F.2d 1210, 1214 (11th Cir. 1992) ("Sheriff's departments and police departments are not usually considered legal entities subject to suit.").  Accordingly, Houston County Sheriff's Office is inappropriately named as a Defendant in this action.

### C.  Claims Against Sheriff Cullen Talton

Smith has not explicitly alleged any claims against Sheriff Talton in her complaint.  Presumably, she means to hold him vicariously liable for Stokes's actions, directly liable for the alleged unconstitutional policies and customs of the Houston County Sheriff's Office, or directly liable for his alleged failure to properly supervise or train Stokes.

"Supervisory officials cannot be held liable under [Section] 1983 for the unconstitutional actions of their subordinates based on respondeat superior liability."  *Gray v. Bostic*, 458 F.3d 1295, 1308 (11th Cir. 2006) (citation omitted).  Instead, "[a] claim based on supervisory liability must allege that the supervisor: (1) instituted a custom or policy which resulted in a violation of the plaintiff's constitutional rights; (2) directed his subordinates to act unlawfully; or (3) failed to stop his subordinates from acting unlawfully when he knew they would."  *Gross v. White*, 340 F. App'x 527, 531 (11th Cir. 2009) (citing *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1331 (11th Cir. 2007)).

Smith has not alleged any of these prerequisites necessary to sustain a claim against Sheriff Talton based on supervisor liability nor has she provided any supporting evidence to show some other basis for holding him liable pursuant to Section 1983. Accordingly, Sheriff Talton is entitled to summary judgment on any claims asserted against him in his individual or official capacity.

### D.  False Arrest Claim

Smith claims that Stokes violated her Fourth Amendment rights because Stokes lacked probable cause to arrest her.  Stokes argues that he had probable cause to arrest Smith, and even if he did not, he is nevertheless entitled to qualified immunity because he at least had arguable probable cause.

"Under the Fourth Amendment, an individual has a right to be free from 'unreasonable searches and seizures' .... [and] an arrest is a seizure of the person." *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007).  "The 'reasonableness' of a seizure or arrest under the Fourth Amendment turns on the presence or absence of probable cause."  *Case v. Eslinger*, 555 F.3d 1317, 1326 (11th Cir. 2009) (citing *Skop*, 485 F.3d at 1137).  "The 'existence of probable cause at the time of arrest constitutes an absolute bar to a [S]ection 1983 action for false arrest.'"  *Rushing v. Parker*, 599 F.3d 1263, 1265 (11th Cir. 2010) (quoting *Case*, 555 F.3d at 1367-27).  However, it is not necessary to address probable cause to determine whether Smith has pled a viable false arrest claim.  To avoid Stokes's qualified immunity defense, Smith must do more; she must establish the absence of arguable probable cause.

"Qualified immunity offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known.'" *Sherrod v. Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "[T]here can be no doubt" that officers effectuating an arrest are performing discretionary duties.  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).  "'Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply.'" *Edwards v. Shanley*, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting *Lewis v. City of West Palm Beach,* 561 F.3d 1288, 1291 (11th Cir. 2009)).  To meet this burden, a plaintiff must establish "the officer's conduct amounted to a constitutional violation" and "the right violated was 'clearly established' at the time of the violation."  *City of West Palm Beach*, 561 F.3d at 1291.  This two-step analysis may be done in whatever order is deemed most appropriate for the case.  *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

        The clearly established law must provide a defendant with "fair warning" that his conduct deprived the plaintiff of a constitutional right.  *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002).  A plaintiff "can demonstrate that the contours of the right were clearly established in several ways."  *Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012).  First, a plaintiff can show that "a materially similar case has already been decided."  *Id.* (internal quotation marks and citations omitted).  Second, a plaintiff can point to a "broader, clearly established principle [that] should control the novel facts [of the] situation."  *Id.* (internal quotation marks and citation omitted).  "Finally, the conduct involved in the case may 'so obviously violate[ ] th[e] constitution that prior case law is unnecessary.'"  *Id.* (citations omitted).  Clearly established precedent in this Circuit

means decisions of the United States Supreme Court, the Eleventh Circuit, and the highest court of the pertinent state.  *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007).

In the Eleventh Circuit, a defendant is entitled to qualified immunity for false arrest claims unless the plaintiff can show the absence of arguable probable cause. Arguable probable cause requires only that "under all of the facts and circumstances, an officer reasonably could—not necessarily would—have believed that probable cause was present."  *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004) (citation omitted).  "This standard recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause but does not shield officers who *unreasonably* conclude that probable cause exists."  *Skop*, 485 F.3d at 1137.  What is relevant for qualified immunity purposes is "the information known to the defendant officers or officials at the time of their conduct, not the facts known to the plaintiff then or those known to a court later."  *Jones v. Cannon*, 174 F.3d 1271, 1283 n.4 (11th Cir. 1999) (citations omitted).  Whether an arresting officer possesses arguable probable cause "depends on the elements of the alleged crime … and the operative fact pattern."  *Skop*, 485 F.3d at 1137-38 (internal citation omitted).

Smith was arrested for the crimes of Obstruction of an Officer, in violation of O.C.G.A. § 16-10-24; Obstructing Highways, in violation of O.C.G.A. § 16-11-43; Disorderly Conduct, in violation of O.C.G.A. § 16-11-39; and Exceeding Maximum Speed Limits, in violation of O.C.G.A. § 40-6-181.[5]  (Doc. 25-1 at 1, 5, 19).  Smith has

---

[5] Smith was also arrested for the offense of Criminal Defamation, in violation of O.C.G.A. § 16-11-40, but she was not charged with this offense because the statute was previously held unconstitutional.  (Doc. 25-1 at 5, 16).

not presented any evidence to rebut Stokes's evidence that she was speeding. Stokes's on-board radar device clocked Smith at 72 miles per hour in a 55 miles per hour zone.[6]  (Doc. 25-1 at 2).  Speeding is a misdemeanor under Georgia law.  *See* O.C.G.A. § 40-6-1.  Thus, based on his own observation of Smith's vehicle and the confirmation from his radar device that she was speeding, Stokes reasonably believed he had probable cause to arrest Smith for violating O.C.G.A. § 40-6-181.  *See* O.C.G.A. § 17-4-23(a) ("A law enforcement officer may arrest a person accused of violating any law or ordinance governing the operation, licensing, registration, maintenance, or inspection of motor vehicles by the issuance of a citation, provided the offense is committed in his presence or information constituting a basis for arrest concerning the operation of a motor vehicle was received by the arresting officer from a law enforcement officer observing the offense being committed … ."); *United States v. Wilson*, 853 F.2d 869, 872-73 (11th Cir. 1988) (construing O.C.G.A. § 17-4-23(a) as giving law enforcement officers discretion to issue citations or make custodial arrests for traffic offenses).

Smith was also charged with felony Obstruction of an Officer.  (Doc. 25-1 at 14). O.C.G.A. § 16-10-24(b) provides:

> Whoever knowingly and willfully resists, obstructs, or opposes any law enforcement officer … in the lawful discharge of his official duties by offering or doing violence to the person of such officer or legally authorized person is guilty of a felony and shall, upon conviction thereof, be punished by imprisonment for not less than one nor more than five years.

---

[6] Further, Stokes's expert witness testified that Smith had to be travelling at an average speed of 68.7 miles per hours to clear the distance recorded on Stokes's dashboard camera.  While only the facts known to an officer at the time of arrest are relevant to the arguable probable cause inquiry, the expert's testimony clearly supports Stokes's version of events.

Stokes alleged that Smith obstructed and hindered him by physically fighting with her hands and feet.  (Doc. 25-1 at 14).  This statute does not require that the arrestee actually injure the officer.  "[S]winging at or kicking at an officer while resisting arrest, without actually landing a punch or a kick, has sufficed to sustain a conviction under this statute."  *Sampson v. State*, 283 Ga. App. 92, 94, 640 S.E.2d 673, 675 (Ga. App. 2006) (citations omitted).  Based on the evidence presented, a reasonable officer could have concluded that Smith was not just passively resisting arrest but, rather, that she was physically fighting Stokes to prevent him from handcuffing her and taking her into custody.  Because Stokes had at least arguable probable cause to arrest Smith for either of these violations, the Court need not consider the remaining bases for her arrest.  *See Durruthy v. Pastor*, 351 F.3d 1080, 1089 n.6 (11th Cir. 2003) (An officer "is shielded by qualified immunity so long as [he] had probable cause to arrest [Smith] for *any* offense.").  Thus, the Court finds that Stokes is entitled to qualified immunity as to Smith's false arrest claim.

### E.  Excessive Force Claim

Smith next claims Stokes used excessive force against her in violation of the Fourth Amendment by forcibly removing her from her vehicle and hitting her in the back, neck, and head.[7]  Smith also claims Stokes slammed her on the hood of his vehicle, slammed his patrol car door on her legs, and hit her in the knee while she was in the

---

[7] Smith also claims her Fourteenth Amendment rights were violated by Stokes's alleged use of excessive force.  However, Smith's excessive force claim is more properly analyzed under the Fourth Amendment.  *See Graham v. Connor*, 490 U.S. 386, 394 (1989) ("Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment[.]").  Smith does not allege any excessive force was used after she was placed in Stokes's vehicle and transported to the jail.

back of his vehicle.  Stokes contends that his use of force was reasonable in light of the extent to which Smith resisted arrest.

As noted above, Stokes was carrying out a valid arrest when he allegedly used excessive force against Smith.  Thus, he was clearly acting within the scope of his discretionary authority.  Therefore, the Court will first determine whether the force used by Stokes to arrest Smith amounted to a constitutional violation.  "'Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'"  *Lee*, 284 F.3d at 1197 (quoting *Graham*, 490 U.S. at 396).  "[T]he force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force ... ."  *Id.* at 1198.  "[A] minimal amount of force and injury … will not defeat an officer's qualified immunity in an excessive force case."  *Nolin v. Isbell*, 207 F.3d 1253, 1258 (11th Cir. 2000).

> Whether an officer used excessive force turns on a number of factors, such as "the severity of the crime, whether the suspect pose[d] an immediate threat, and whether the suspect [was] resisting or fleeing.  Use of force must be judged on a case-by-case basis[.]" … Because of this lack of a bright-line standard, "qualified immunity applies unless application of the standard would inevitably lead" a reasonable officer in the defendant's position to conclude that the force was unlawful.

*Gold v. City of Miami (Gold I)*, 121 F.3d 1442, 1446 (11th Cir. 1997) (quoting *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993)).

The video taken by Stokes's dashboard camera clearly shows that his use of force to arrest Smith was reasonably proportionate to the need for that force.  As Stokes began to exit his vehicle for a routine traffic stop, Smith was clearly screaming, using expletives, and yelling that Stokes better not come over to her vehicle.  Thus, Stokes

observed her acting aggressively before he even spoke with her and could have reasonably perceived her to be an immediate threat.  Contrary to Smith's multiple allegations that Stokes never provided any explanation for pulling her over, the video recorded Stokes clearly telling Smith she was pulled over for speeding and the speed limit for the highway she was travelling on was 55 miles per hour.  Despite his response, Smith continued to irately question his justification for pulling her over and failed to follow his instructions to hand over her license and insurance.  Stokes also wrote in his investigation report that Smith made a throat cutting gesture with her right index finger twice in response to his questions.  Stokes then warned her failure to comply would result in an obstruction charge and being taken to jail.  Instead of complying, Smith told Stokes she would not go to jail for obstruction because refusing to hand over her license and insurance card did not qualify as obstruction.  Smith's son can be heard telling Smith to "chill out" and that Stokes was "just doing his job."

Stokes gave Smith a choice; to calm down or to go to jail.  Smith did not calm down, and Stokes walked around the vehicle to place her under arrest.  Stokes opened her door and then ordered her to unfasten her seatbelt and exit the vehicle because she was going to jail.  At this point, Smith clearly began resisting arrest by refusing to get out and telling Stokes that she cooperated.  Because Smith refused to exit the vehicle and because she previously indicated she might flee the scene by placing her hand on the gear shift, Stokes reasonably used force to pull Smith out of the vehicle to effectuate the arrest.

Smith alleges that after Stokes pulled her out of the car he "violently assaulted" her in a "brutal attack" as he "hit her in the back, neck and head" with such force that

she feared he would break her neck.[8]  (Doc. 1 at ¶¶ 15-16).  The video never shows Stokes striking Smith.  Instead, the video shows Stokes struggling with Smith to get her to lie flat on the ground so he could handcuff her.  In response, she jerked her hands back to the ground whenever Stokes got ahold of one and yelled many times at her son to "take a picture."  Stokes threatened to use his ASP baton multiple times if Smith did not give him her hands, but he never used the weapon on her.  Stokes did not use any other weapons to carry out the arrest.  Contrary to Smith's allegation that Stokes slammed her to the ground after handcuffing her and pulling her upright, the video does not show Stokes forcefully or intentionally slamming her to the ground, but rather, it looks as though she tripped while Stokes was moving her backwards to his vehicle.

Further, Smith has not shown any injuries to indicate the force used was excessive.  Smith claims the photographs attached to her deposition show she received multiple bruises and abrasions from this incident in addition to head and neck injuries.  Apart from the photographs showing Smith in a neck brace, however, the Court cannot discern any physical injuries from the photographs.  Smith has not produced any other evidence to show she received the alleged injuries.  Moreover, even if she did receive some bruises or abrasions from the scuffle, such minor injuries do not defeat an officer's qualified immunity.

Under the circumstances depicted in the video, including Smith's initial erratic and threatening behavior, her noncompliance with Stokes's numerous lawful

---

[8] Smith also alleges Stokes hit her in the knee and slammed his patrol vehicle's door on her legs multiple times.  Because of its position, the dashboard camera captured only audio once Smith was placed into the back of the patrol vehicle.  No blows or strikes are apparent from the audio.  Most of the audio at that point recorded Stokes instructing Smith multiple times to put her legs and feet inside the vehicle and Smith refusing because she wanted to pick up her license and insurance card.  In any event, Smith has not produced any evidence to rebut Stokes's evidence that these injuries did not occur.

commands, and her prolonged attempt to resist arrest, a reasonable officer in Stokes's position would find the amount of force used to arrest Smith was not unlawful.  Thus, Smith has failed to establish a constitutional violation on her excessive force claim, and Stokes is entitled to qualified immunity.

### III.    CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment is **GRANTED.**

**SO ORDERED,** this 4th day of November, 2013.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT